Filed 3/19/19

CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re the Marriage of C.T. and R.B.

C.T.,

      Appellant,

v.

R.B.,

      Respondent.

E070089

(Super.Ct.No. IND092451)

OPINION

APPEAL from the Superior Court of Riverside County.  Dale R. Wells and Mickie Elaine Reed, Judges.*  Reversed.

Law Offices of Marjorie G. Fuller for Appellant.

R.B., in pro. per., for Respondent.

* Judge Reed is a Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)

# I.

## INTRODUCTION

Appellant, C.T. (Mother), appeals a child custody order changing primary physical custody of her 12-year-old son, A.B., from Mother in California to A.B.'s father, respondent, R.B. (Father), in Arkansas.[1] A.B. has lived with Mother since his birth in 2006. Mother and Father (Parents) separated in 2007. The trial court entered a final child custody order in 2010, with Mother's home ordered A.B.'s primary residence. In 2011, Father moved from California to Arkansas and has been living with his parents (Grandparents). In 2017, Mother and Father both requested sole physical custody of A.B.

Mother contends Father failed to meet his burden of establishing that moving A.B. to Arkansas would not cause detriment to A.B., and that the change in physical custody was in A.B.'s best interests. We agree. We therefore reverse the child custody order awarding Father primary physical custody.

# II.

## FACTS AND PROCEDURAL BACKGROUND

Mother and Father married in 2005, separated in March 2007, and divorced in December 2007. Mother is 43 years old and has been a special education teacher for over 16 years. She has a bachelor of arts degree, masters degree in education, and a teaching credential. In 2016, Mother remarried and lives with A.B., her husband J.T. (Stepfather),

---

[1] This court granted Mother's writ petition for supersedeas and ordered the child custody order stayed pending issuance of the remittitur on the instant appeal.

2

and his son, S.T. (16 years old), and daughter, A.T. (15 years old). Mother's 18-year-old son by another marriage, E.H., also initially lived with Mother and Stepfather.

Father is 53 years old, has a bachelor of science degree in physics and mathematics, was a doctoral candidate in physics at Texas A&M University, and passed his qualifying examinations for his doctorate in 1988, but did not complete his doctorate degree. Father also received in 2001 a masters degree in business administration from the University of California, Irvine. Father was employed from 2004 to May 30, 2008, with M&M Sweeping, Inc. as a general manager. M&M Sweeping, Inc. is listed as a community asset in Mother's petition for divorce.

A. *2008 Custody and Support Order*

On May 8, 2008, the court ordered temporary joint legal and physical custody of A.B., with primary physical custody awarded to Mother. The trial court ordered a 31 percent time share with Father and 69 percent with Mother. The court ordered Father to begin paying $677 in child support on August 1, 2007. Father and Mother were also ordered to share the cost of child support 50/50.

On May 30, 2008, Father's employment at M&M Sweeping, Inc. terminated.

B. *2009 Final Custody and Support Order*

During a child custody and visitation hearing in August 2009, the court stated that A.B. was to begin overnight visits with Father in September 2009. Mother's attorney suggested some "transition days" before beginning the overnight visits. Regarding overnight visits, Mother said, "I will not do that. I will not do this right here. I will not

do the September whatever." Mother's attorney explained that Mother did not "want to just drop him from zero, to just drop him into a complete weekend." The court responded that Mother must do whatever the court ordered. Mother asked, "Overnight, just like that, when he hasn't seen him in a year?" The court replied, "If I order it, you will do it." The court ordered joint legal and physical child custody and visitation. The court also ordered Father to pay $533 in child support based on a DissoMaster printout.

On September 29, 2009, the trial court entered a final custody and support order. The court ordered custody and visitation to be as stated in the August 2009 order pursuant to referral to mediation. The court denied spousal support and terminated jurisdiction over spousal support. Jurisdiction was reserved over child support. The court found that Father was unemployed, had not paid any child support, and owed Mother $8,801 in child support arrearages through August 18, 2008. The court ordered Father to pay Mother $674 in monthly child support beginning in February 2009, and $533 per month in child support beginning in June 2009. The court also ordered Father to pay childcare costs of $135 per week.

C. *2010 Modified Custody and Support Order*

In May 2010, Mother filed a motion for modification of custody and support. The court ordered mediation. On June 22, 2010, mediator Emelinda McGinnis, L.C.S.W. met with both parents and filed a memorandum with the court reporting the following. Father last saw A.B. in December 2009. In October 2009, Parents modified Father's time share plan because Father did not have transportation and was living in a trailer in Hemet.

4

Mother transported A.B. to Hemet and Father had day visits. In December 2009, Mother permitted Father to take A.B. to Arkansas for 10 days. When Father returned, he discovered his trailer had been moved and he did not have a place to live. Father therefore did not visit with A.B. but e-mailed Mother informing her of his home situation and forfeited his parenting time. At the time of mediation in June 2010, Father was living in Bermuda Dunes and wished to resume visitation. He sent Mother numerous e-mails requesting visitation. Mother rejected his requests.

McGinnis reported that Mother opposed any overnight visitation at the present time. Mother requested a step-up plan because Father had no phone contact with A.B., Father had not seen A.B. for six months, and Father had not completed his court-ordered coparenting program. Mother also requested to inspect his home environment to assess suitability for A.B. McGinnis concluded "it appears that mother is the parent least likely to share the child." When McGinnis asked Mother about an e-mail in which she rejected Father's request for visitation in San Diego where a mutual friend resided, Mother said she was unaware of the address, which was untrue. Mother later said she did not feel comfortable allowing the child to go with Father at that time. When McGinnis discussed information about what was in A.B.'s best interest, Mother said, "'I don't care what the order says.'" McGinnis concluded the family was "highly conflicted" and would benefit

from coparenting counseling and suggested a special master rather than an Evidence Code section 730 evaluation (730 evaluation).[2]

In July 2010, the court entered an order pursuant to referral to mediation, ordering joint legal and physical custody, with Mother's home designated as A.B.'s primary residence. The court ordered a step-up time share plan for Father. The court's order incorporated and adopted McGinnis's recommended order.

D. *Request for Order to Correct Clerical Mistakes*

In 2011, Father moved to Arkansas to live with his parents and has resided there ever since.

In 2015, the Arkansas Office of Child Support Enforcement attempted to register in Arkansas the California 2009 child support order. Because there were irregularities or clerical errors in the order, the Arkansas court in January 2017, stayed enforcement of the order until the clerical errors were corrected. In February 2017, Father filed in California a request for an order to correct the clerical mistakes in the 2009 order (clerical mistake motion). Father asserted the order was incorrect because it misstated childcare costs and the child support was erroneously calculated based on a zero time share for Father, whereas the court had found he had a 26 percent time share. Father did not request physical custody of A.B. or modification of his time share.

_____

[2] An Evidence Code section 730 "'child custody evaluation' is an expert investigation and analysis of the health, safety, welfare, and best interest of children with regard to disputed custody and visitation issues." (Cal. Rules of Court, rule 5.220(c)(3).)

At the hearing on Father's clerical mistake motion in April 2017, the trial court ordered the September 29, 2009, order corrected nunc pro tunc, as requested by Father. As a result of the modified increase in Father's time share from zero to 26 percent and reduction of Father's childcare contribution, monthly child support paid to Mother was reduced to a net $82. During the hearing, Mother made an oral motion to change child support, noting that Father's time share had decreased because of his move out of state and Father did not begin seeing A.B. until four years before the hearing (2013). The trial court set a hearing on Mother's request for support modification and instructed Mother and Father to file income and expense declarations (I&E declarations).

E. *Parents' Requests for Sole Physical Custody*

In May 2017, Mother and Father filed I&E declarations and supporting declarations. Father acknowledged he did not have any health insurance available for A.B. Mother requested sole physical and legal custody of A.B., with a proposed time share plan. Mother stated that she was requesting modification of support and custody because Father had moved to Arkansas in 2011, and Father had used only 35 days of visitation with A.B. each year, beginning in 2013 through 2016. Mother further stated that Father had refused to pay child support or provide any material financial support for A.B.'s childcare, educational expenses, extracurricular activities, medications, or medical bills. Mother noted that Father had sent her an e-mail stating that "'the reality also is that I won't ever turn any cash over to you.'"

In June 2017, Father filed a responsive declaration. For the first time, Father requested the court to order A.B. to relocate and live with him in Arkansas. He proposed the court order joint legal and physical custody, with his home ordered A.B.'s primary residence and visitation ordered for Mother. As to child support, Father requested Mother pay him guideline support of $1,018 a month, based on her anticipated 27.4 percent time share.

Father stated in a lengthy supporting declaration the following reasons why he believed the court should order that A.B. live with him: The mediator, McGinnis, had stated in her report that Mother was the parent least likely to share the child; Mother had said she would not comply with the court's time share order requiring A.B. to immediately spend the weekend with Father, without any transition visitation days beforehand; Mother had not told Father the names of any of A.B.'s treating doctors; Mother had not informed Father or obtained his consent regarding A.B.'s medical treatment or counseling; Father was unable to obtain A.B.'s school records or information because Mother had not designated Father as a parent or emergency contact with A.B.'s school; Mother did not inform Father until February 2017, that she remarried in 2016, or provide her new address and A.B.'s school address; Mother scheduled A.B.'s activities with Mother's new family to conflict with Father's visitation time; Mother did not ask Father's consent to enroll A.B. in a private school, church camp or other extracurricular activities; Mother did not obtain Father's consent to allow A.B. to use firearms with Stepfather; A.B.'s school records show that he had four unexcused absences and nine

8

tardies during the current school year; Mother installed "spy apps" and a camera to monitor Father's conversations with A.B.; Mother did not provide the names, addresses and phone numbers of A.B.'s childcare providers; and Mother made negative comments to A.B. about Father and used A.B. as a messenger between Mother and Father.

Father further asserted that Mother became intoxicated while with A.B.; Mother struck A.B. in the face; Mother was ordered in 2012 to complete a parenting class in connection with a prior marriage as a result of "disturbing allegations" against her; Stepfather's prior divorce was a high conflict divorce in which Mother interjected herself, resulting in a civil harassment action against her and involvement with law enforcement; Mother denied Father visitation time with A.B. after Mother had agreed to let A.B. spend three weeks with Father during the summer in 2015 and 2016, and A.B. wanted to stay longer; Mother refused to let A.B. visit Father during the summer of 2017 and refused to drive A.B. to Los Angeles to visit Father on Father's Day in 2017, and then told Father A.B. did not want to spend Father's Day with him; when A.B. has to go home after visiting Father, A.B. "cries and cries, literally howling, from late at night into the early morning hours, as the date to return to California approaches"; and Mother on two occasions complained A.B. had lied to Father about her, contrary to Father's belief that A.B. was generally truthful.

Mother filed a responsive declaration stating that Father had not shown any interest in seeing A.B., reflected by his failure to show up on numerous occasions for scheduled visitation while Father lived in California. Also, Father did not notify her that

9

he had moved to Arkansas, where he was undergoing psychiatric evaluation after multiple suicide attempts, and was under the supervision of his parents in Arkansas. Mother described A.B. as "a brilliant, intelligent, caring, loving, funny and amazing son. He excels in school and was on the Honor Roll all quarters, and . . . has many friends at church and school, and enjoys swimming, playing baseball, and flag football, last spring his baseball team placed 1st." Mother denied that A.B.'s cell phone ever had a spy app. She also denied ever putting her "hands on [her] step-children." Mother further stated that Father had ignored all financial obligations, including not paying child support for 10 years.

F. *2017 Child Custody Hearings*

During the continued custody hearing in September 2017, the court noted that the parties had attended mediation and the mediator recommended joint legal custody, with Mother to have physical custody of A.B. Father disagreed with the recommendation for essentially the same reasons stated in his declaration, emphasizing that Mother had violated the custody order many times. Mother objected to A.B. living with Father, noting that in 2006, Father was hospitalized for attempting suicide, and that in 2007, Father had threatened A.B.'s health care practitioners, family, and threatened to burn down her house and "kill all of us." Mother further stated that Father tried to kill A.B. when he was three months old. The court said that Mother was making hearsay statements the court could not rely on. The court told Father he did not need to respond

10

to any of what Mother had just said and set the custody and support matter for an evidentiary hearing in October 2017.

In October 2017, Father filed a declaration stating that he lived with his mother and father, who were 81 and 86 years old, respectively. He had been unemployed since May 30, 2008. Father stated he had earned during the past 16 months $8,473 from sweepstakes, $300 from the city parks and recreation department, and $300 for providing personal services.

On October 25, 2017, and October 26, 2017, the court held an evidentiary hearing on Mother's and Father's requests for sole custody. After hearing argument and testimony, and considering documentary evidence, the court ordered joint legal custody, physical custody changed to Father, and visitation for Mother.

G. *Motion for Reconsideration*

After retaining an attorney, on November 6, 2017, Mother filed a motion for reconsideration of the court's October 26, 2017, order or, alternatively, requested a new trial, after a 730 evaluation. Mother also requested the court to vacate the October 26, 2017, order. Mother argued the trial court failed to apply the correct law under *Jane J. v. Superior Court* (2015) 237 Cal.App.4th 894 (*Jane J.*) and *In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947. Mother also requested a stay of the child relocation order entered on October 26, 2017.

On December 21, 2017, the court denied Mother's motion for reconsideration and for a new trial, with a 730 evaluation. The court ordered A.B.'s move stayed until after

the end of the school year, to allow Mother to file an appeal. The court concluded *Jane J.* is distinguishable because it involved an out-of-state custody order registered in California, which the California court could only enforce, not modify. The court also noted that, unlike in *Jane J.*, Mother repeatedly failed to obtain Father's consent regarding decisions on school, daycare, extracurricular activities, counseling, and health care.

The court ordered that Father was to take A.B. to Arkansas on December 26, 2017, and A.B. was to return to Mother in California on January 5, 2018. The court stated that it made the change of custody order because "I became convinced that it was necessary for me to change custody because it became apparent that mom has not and would . . . not comply with the existing order after having been warned about it in the order of 2010."

H. *December 29, 2017, Visitation Hearing*

On December 27, 2017, A.B. did not want to go with Father. A.B. texted Mother, pleading for her to come get him and threatening to commit suicide. Mother informed Father of A.B.'s texts and it was agreed that Mother would come get A.B. That same day, Father filed an ex parte request for an emergency order regarding his visitation during winter break. The court heard the matter on December 29, 2017. Both parties testified. The court also discussed with A.B., in camera and out of the presence of Parents, his reasons for not wanting to go with Father. Afterwards, the court ordered that A.B. was to leave with Father on December 30, 2017, and return on January 7, 2018.

12

I. *January 9, 2018, Modified Custody Order*

On January 9, 2018, the court entered its final order on the October 2017 custody

modification proceeding.  The court ordered Mother and Father to have joint legal

custody, Father to have primary physical custody, Mother to have visitation as specified,

and both parents to attend a coparenting course.  Mother filed a notice of appeal of the

January 9, 2018, custody order.[3]

III.

STANDARD OF REVIEW

The trial court has discretion to modify an existing custody order based on

changed circumstances, or to grant or deny a move-away request.  (*Marriage of Burgess*

(1996) 13 Cal.App.4th 25, 32 (*Burgess*); *Jane J.*, *supra*, 237 Cal.App.4th at p. 901.)

"This discretion may be abused by applying improper criteria or by making incorrect

legal assumptions."  (*Jane J.*, *supra*, at p. 901.)  The Court of Appeal applies an abuse of

discretion standard of review to the trial court custody ruling.  Because the trial court

must exercise its discretion in light of important policy considerations, appellate courts

are less reluctant to find an abuse of discretion when custody is changed than when

custody is originally awarded.  Reversals of changed custody orders have not been

---

[3]  On November 13, 2018, Father filed a motion for judicial notice, requesting this court to judicially notice seven documents, including attachments, filed in the trial court between March 12, 2018, and May 24, 2018.  These documents concern matters occurring after the trial court entered its January 9, 2018, custody order, which is the subject of the instant appeal.  The documents are therefore not relevant to this appeal, as not being of substantial consequence to the determination of the appeal.  Father's request for judicial notice is thus denied.  (Cal. Rules of Court, rule 8.252; Evid. Code, § 459.)

uncommon. (*Id*. at p. 903.) This is because, "'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role.' [Citation.] This principle avoids an endless round of emotionally and financially draining litigation in the family law courts. [Citation.]" (*Ibid.*)

The instant case involves modification of a 2010 final custody order. This case is not a *custodial* parent move-away case. Rather, it involves the noncustodial parent, Father, moving out of state in 2011, and then six years later requesting physical custody of A.B., which requires A.B. to move from California to Arkansas.

## IV.

## MODIFICATION OF CHILD CUSTODY ORDER

Mother contends the trial court abused its discretion by ordering physical custody of A.B. changed from Mother to Father without requiring Father to meet his burden of establishing that moving A.B. to Arkansas would not cause detriment, and that the change in physical custody was in his best interest. We agree.

A. *October 2017 Evidentiary Custody Modification Hearing*

During the evidentiary custody hearing on October 25 and 26, 2017, both parties appeared in propria persona, testified, presented argument and evidence, and examined and cross-examined witnesses. During her opening statement, Mother conceded she had violated the child custody orders but asserted the violations were technical and did not constitute sufficient grounds for moving A.B. to Arkansas to live with Father. Mother

noted Father did not complain of any of her violations before the instant custody modification proceedings initiated in 2017.

Father called Patricia Griffin as a witness. She testified that in 2010, she let Father live in her backyard in a tent in Lake Hemet. She also testified that on July 17, 2017, she was with Father and grandmother when they picked up A.B. to fly with him to Arkansas. A.B. appeared happy to see Father.

Grandmother testified A.B. visited Father and Grandparents in Arkansas from July 18, 2017, to August 9, 2017. A.B. seemed happy. If A.B. lived with Father, she was willing to help support Father and A.B., and A.B. would have his own room. Grandmother said she would help A.B. with his schoolwork. She had been a teacher for 30 years, teaching 7th, 8th, and 9th grades. Father had lived with Grandparents since 2011 and had not paid any rent.

McGinnis testified that it appeared from the photographs of A.B. and Father that A.B. was bonded to Father. Father asked McGinnis whether parental alienation by Mother had occurred. McGinnis said she could not make a conclusion or assessment regarding parental alienation.

Father testified that one day in September 2013, A.B. had two face time calls with Father that totaled over eight hours, during which A.B. and Father played games. Father testified that on September 30, 2017, he went to pick up A.B. at Mother's home for a visit. A.B. was crying and would not look at Father. He refused to go with Father. A.B. ran back to his house and would not come out.

15

Father said he subpoenaed A.B.'s school records and they showed that A.B. had good grades but 10 tardies and 10 absences during the past school year. The school records also showed Father was not listed on A.B.'s school authorization form as a parent or emergency contact. Father acknowledged he had a Welfare and Institutions Code section 5150 hospitalization in 2006.

Mother testified that when A.B. was young, Father had been very volatile due to his psychiatric condition and treatment. Mother denied she had made any negative comments about Father to A.B. Mother explained that the reason A.B. refused to go with Father on September 30, 2017, was because the day before, S.T. told A.B. that he had seen Father at the home of Stepfather's ex-wife, Tricia. Father was helping Tricia with her case. Stepfather went to get S.T. at Tricia's home and Father answered the door. Mother denied ever hitting A.B., with the exception of "smacking" him once in the mouth when he said the F-word. Mother denied frequently yelling or cursing in her home, and denied that Stepfather broke things. She also denied they struck each other.

Mother further testified she did not list Father as a school emergency contact because she believed he was not a "viable option" because he was in Arkansas. Mother stated she wanted and had promoted Father's involvement with A.B. Mother testified she had notified Father of some of A.B.'s activities and generally got no response from Father. He could not participate because he was in Arkansas. She did not tell him about everything because a lot went on in a week and A.B. was very active, but she tried to keep Father "in the loop."

16

When Mother called Father as a witness, he testified that his last contact with A.B. was on September 2, 2017, when Father texted A.B. A.B. did not respond. Before that, Father had not called him for two and one-half months. Father e-mailed Mother requesting four weekend visits with A.B. starting with the weekend of September 30, 2017. Father did not keep any of those agreed upon visits because of the incident on September 30, 2017. Mother texted Father that he could pick up A.B. the following weekend but Father did not do so.

Father testified that from 2007 to 2008, he had visitation with A.B. four weekends per month. Then in 2008, the economy collapsed and he "lost everything [he] owned." He could not care for A.B. then. Father began visits with A.B. again in 2009. In 2011, Father moved to Arkansas and A.B. travelled with Father there for a 10-day visit. Since 2012, when A.B. became old enough to fly by himself, A.B. visited Father three times a year, during spring break, summer vacation, and Christmas. Father provided support for A.B. by buying him things, such as a bat, gloves, clothes, an Xbox One, Wii U, and other games.

Father was in California for between 60 and 90 days before A.B.'s summer visit with Father in Arkansas from July 18, 2017, to August 9, 2017. Father acknowledged that, while in California, he did not see A.B. from June 16, 2017, until July 18, 2017. The last time Father saw A.B. was during the incident on September 30, 2017. Father acknowledged he stayed in Chino Hills with Mother's husband's ex-wife, Tricia, for

17

about 10 days, beginning on September 26, 2017. Tricia's home is five or 10 minutes from Mother's home. Yet Father did not visit A.B.

Father testified he had been self-employed on and off since 2011. His last W-2 was in 2008. His self-employment consisted of "sweepstaking," in which he entered sweepstakes roughly 700 times a day periodically from 2011 through 2016. Sometimes he would look in dumpsters for sweepstakes codes on cups. A.B. went with Father "dumpster diving" on one occasion. Father's largest sweepstakes win was $20,000 in 2013, from United Parcel Service. The next largest win was $3,800 in 2013 from Coors Light.

Father explained that he did not work because he moved to Arkansas during the economic upheaval and began "sweepstaking." Then in 2012, the child support order was entered in the California court, and was sent to Arkansas under the Uniform Interstate Family Support Act. Father anticipated going to trial on the support order sometime between 2012 and 2015. It therefore "made no sense to get a job with that trial pending." Father explained that his e-mail statement to Mother that "'[t]he reality also is I won't ever turn any cash over to you,'" meant he would not give her any cash. Father denied it meant he refused to pay her child support or work. Father stated he did not own a car but could use his parents' car to transport A.B. Father's parents had supported him during the past year. Grandparents were willing to support Father and A.B. "initially" until Father was able to do so.

18

After the parties submitted on the evidence and gave their closing arguments, the trial court stated its findings and rulings. The court explained the case is not a *LaMusga*[4] move-away case because the custodial parent is not moving. The court concluded that, nevertheless, the *LaMusga* factors applied because changing custody would result in moving the child 1,681 miles from his current home in California to Arkansas. The court stated that the factors weighing in favor of not moving A.B. included A.B.'s stability and continuity living with Mother, moving A.B. to Arkansas would involve moving him far away, and A.B. attends church, enjoys his school, and is doing well there.

The court found, on the other hand, that A.B. is bonded to Father and A.B. enjoys his time with Father. The court was not concerned about the September 30, 2017, incident in which A.B. refused to go with Father, because some factor other than Father caused that behavior. The court noted there were many photographs demonstrating A.B.'s close relationship with Father, although his relationship with Mother also appeared to be good. The court weighed the following factors in favor of moving A.B. to Arkansas: Mother has a long history of not complying with the court custody order and she said she did not care what the court order is; and the mediator concluded Mother was the least likely parent to share the child.

The court told Mother that "we didn't have to have a two-day trial because as soon as you finished your opening statement Mr. Burns could have said 'submit.'" The court found that Mother had failed to comply with the 2010 custody order by (1) not providing

---

[4] *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*).

Father with the name and address of each health practitioner who examined or treated A.B., (2) not providing Father with access to A.B.'s school, medical and dental records, (3) depriving Father of his right to consult with A.B.'s service providers, (4) not designating Father as an authorized emergency contact, (5) not keeping Father informed of A.B.'s activities, (6) not consulting with Father regarding changing A.B.'s school and enrolling A.B. in his current private school, (7) not notifying and discussing with Father selection of A.B.'s doctor, dentist, or other health care professionals, and (8) not notifying Father and obtaining his consent regarding A.B.'s extracurricular activities.

The court found that Mother had demonstrated over the past seven years, since the 2010 custody order, that she would not share A.B. with Father. The court concluded that Mother does not communicate with Father or cooperate with him, and is not willing to put A.B. first, whereas Father is willing to put A.B. first. The court stated that it was not its place to judge why Father ended up living with his parents. The court concluded that, regardless, Father's mother is a retired schoolteacher, Father is good in math, and it is likely A.B. will be well cared for in Father's home. The court noted that the fact Father has not paid child support is not relevant to the determination of child custody. The court concluded that "[t]here's really not any question about what I have to do. [A.B.] is going to move to Batesville, Arkansas to live with dad." The court found it was not in A.B.'s best interest to remove A.B. from school immediately, mid-semester. The court therefore ordered A.B.'s removal to occur in January 2018, at the end of the semester.

In response to the court stating A.B. would move in January 2018, between semesters, Mother replied, "Your Honor, I fear that—[A.B.] is very grown-up. And he has—he can't—him and his father are not in good communication. It's going to go really bad for [A.B.]." The court replied that the parties presented their evidence and he followed the law. Mother ignored the rules for seven years. Mother responded that Father was unavailable, as reflected in e-mails. The court told Mother she had conceded at the beginning of the case that she had violated the custody order, and did so for seven years. Mother replied, "I did. He wasn't around for the weekends. I did everything I could. He's far away." The court nevertheless ordered A.B.'s custody changed from Mother to Father, with visitation for Mother.

B. *Substantial Change in Circumstances*

Mother challenges the January 9, 2018, custody order modifying the permanent custody order entered on July 7, 2010. At the time of the 2010 custody order, Parents were both living in California. The 2010 custody order awarded Parents joint legal and physical custody, with Mother's home ordered A.B.'s primary residence. In 2010, the court ordered joint physical custody with a step-up time share plan for Father, allowing him to increase his time with A.B. from a 31 percent time share. In 2011, actual shared physical custody of A.B. changed when Father moved to Arkansas to live with his parents. Neither parent requested a change in custody at that time, even though after Father moved to Arkansas, in effect, Mother held primary physical custody of A.B.

21

The instant custody dispute originated in 2017, when the Arkansas court notified Father that there were irregularities in the California 2009 child support order which needed to be corrected before Arkansas could proceed with enforcing the support order. Father accordingly filed a petition in California requesting the California court to correct the clerical mistakes. He did not request a change of physical custody. During the hearing on Father's clerical mistake motion, the court granted the motion, ordered the clerical errors corrected nunc pro tunc, and reduced support to $81 based on the findings made at the time of the 2009 custody order, when Father was still living in California. During the hearing, Mother moved to modify child custody and support to reflect the current circumstances, in which Mother had primary physical custody of A.B. This triggered the current dispute over physical custody of A.B., and Father's concerted efforts to relocate A.B. to Arkansas.

It is settled law that ordering a change in custody requires a persuasive showing of changed circumstances affecting the child. (*Jane J.*, *supra*, 237 Cal.App.4th at p. 902.) Such a change must be substantial. A trial court shall not remove a child from the prior custody of one parent and give custody to the other unless there are material facts and circumstances occurring after the prior custody order that "'""are of a kind to render *it essential or expedient for the welfare of the child that there be a change*.' [Citation.] The reasons for the rule are clear: 'It is well established that the courts are reluctant to order a change of custody and will not do so except for imperative reasons; that it is desirable that there be an end of litigation and undesirable to change the child's

22

established mode of living.' [Citation.]"'"" (*Christina L. v. Chauncey B.* (2014) 229 Cal.App.4th 731, 738.); accord, *Jane J.*, *supra*, at p. 902, italics added.) As noted in *Jane J.*, *supra*, at page 903, "It is not enough to argue that it is time to switch sides to give the other parent the opportunity to take control. [Citation.]"

"Ordinarily, after a judicial custody determination, the noncustodial parent seeking to alter the order for legal and physical custody can do so only on a showing that there has been a substantial change of circumstances so affecting the minor child that modification is essential to the child's welfare. [Citation.] As we have explained: 'The [changed circumstance] rule requires that one identify a prior custody decision based upon circumstances then existing which rendered that decision in the best interest of the child. The court can then inquire whether alleged new circumstances represent a significant change from preexisting circumstances, requiring reevaluation of the child's custody.' [Citation.]" (*Burgess*, *supra,* 13 Cal.4th at p. 37, quoting *Burchard v. Garay* (1986) 42 Cal.3d 531, 534.)

As the noncustodial parent seeking a change in the existing custody order, Father had the initial burden of establishing there was a substantial change of circumstances supporting a determination that a different custody arrangement would be in A.B.'s best interests. (*Jane J.*, *supra*, 237 Cal.App.4th at p. 902; *LaMusga*, *supra*, 32 Cal.4th at pp. 1088-1089.) Mother argues Father did not meet his initial burden of proof. We agree. Father has not met his burden of showing that it was essential or expedient for the welfare of A.B. that there be a change in custody.

The record on appeal shows that, since the most recent custody order in July 2010, there have been changed circumstances affecting the child. Father moved to Arkansas in 2011 and began living with his parents. But Father has not established that this change alone constitutes a material fact or circumstance of a kind to render it *essential or expedient for the welfare of A.B. to change his physical custody*. (*Jane J.*, *supra*, 237 Cal.App.4th at p. 902; *Christina L. v. Chauncey B.*, *supra*, 229 Cal.App.4th at p. 738.) Father must not only show substantial changed circumstances but also must show that changing A.B.'s physical custody would not detrimentally affect A.B.'s interest in continuity and stability, and that relocating A.B. is in his best interests. (*Jane J.*, *supra*, at p. 904.)

C. *The Noncustodial Parent's Burden of Proof*

Father argues he has met his burden of proof by establishing that Mother repeatedly violated the custody order and engaged in an ongoing course of conduct designed to frustrate his visitation rights and interfere with his father-son relationship. The father in *Jane J.* raised similar arguments, which the *Jane J.* court rejected. (*Jane J.*, *supra*, 237 Cal.App.4th at pp. 897-898, 907, 910.)

As the trial court noted, *Jane J.* differs factually from the instant case to the extent *Jane J.* involved enforcement of an out-of-state custody order registered in California, whereas in the instant case, Father requested modification of a California custody order. Also, in *Jane J.*, the mother interfered with the father's visitation whereas, here, Mother admitted she violated the custody order by failing to obtain Father's consent and keep

him informed at all times of A.B.'s school, daycare, extracurricular activities, counseling, and health care matters. These factual differences are distinctions without a difference as concerns the custody issue here. *Jane J.* is on point and provides guidance in deciding whether the final January 2018 order modifying A.B.'s physical custody was an abuse of discretion.

In *Jane J.*, when the parents of two boys divorced, the mother lived in Wisconsin with the boys (three and seven years old). The father was in the military, stationed in Hawaii. The parents' marital settlement agreement, deemed a final custody order, stated that, because the father was serving in the military, the mother was given primary physical custody. (*Jane J.*, *supra*, 237 Cal.App.4th at p. 898.) Three years later, the mother moved to California with the boys. The Wisconsin court approved the move. A year later, the father was transferred to Alabama, registered the Wisconsin 2009 custody order in California, and petitioned for an order modifying the Wisconsin custody order to increase his visitation or give him primary physical custody over the boys. (*Id.* at pp. 898-899.) The father accused the mother of blocking him from seeing the boys. The parties agreed to share the cost of an Evidence Code section 730 expert evaluator (730 expert evaluator) providing recommendations regarding the boys' best interests. The trial court, however, declined to appoint a 730 expert evaluator. (*Jane J.,* at p. 899.)

After conducting a hearing, the trial court in *Jane J.* stated it doubted the mother's willingness to facilitate the father's visitation and found the mother had interfered with the father's efforts to visit the boys. The trial court concluded: "'It's time [Father] had

25

an opportunity to parent these children. I'm going to change custody. He needs to be given the opportunity to be the parent that he's striving to be in the limited time that he has.'" (*Jane J.*, *supra*, 237 Cal.App.4th at p. 900.) At that time, the boys were ages nine and 12. The mother filed a petition for peremptory writ of mandate, which the court granted.

The court in *Jane J.* concluded that the father had the burden of establishing that moving the boys from their home in California to his home in Alabama would not cause detriment to the boys and was in their best interests. (*Jane J.*, *supra*, 237 Cal.App.4th at p. 904.) The court explained that, as the noncustodial parent seeking a change of the existing custody order, the father had the initial burden "to make a substantial showing of changed circumstances affecting the children to change the final custody determination of the Wisconsin court." (*Id.* at p. 902.)

The *Jane J.* court held that the trial court abused its discretion in granting the father primary physical custody without weighing relevant factors. (*Jane J.*, *supra*, 237 Cal.App.4th at p. 906.) The *Jane J.* court noted that the trial court's abrupt decision to change custody from the mother to the father "was influenced by an erroneous understanding of the applicable law. Respondent court discounted Father's initial burden, as the moving noncustodial parent, to address the potential disruptive impact of an out-of-state move away, including its effect on the children's existing educational, physical, emotional and familial relationships. Move-away orders are '"one of the most

26

serious decisions a family law court is required to make," and should not be made "in haste.'" [Citation.]" (*Id.* at p. 901.)

The *Jane J.* court rejected the father's argument that the Court of Appeal was required to defer to the trial court's discretionary determination of the children's best interests and therefore affirm the order changing custody, because the mother's conduct was designed to impede the father's visitation and communication with the children. (*Jane J.*, *supra*, 237 Cal.App.4th at p. 904.) *Jane J.* disagreed. (*Ibid.*)

The *Jane J.* court also rejected the father's argument that the case was not a move-away case but noted that the father's burden of proof differed from a custodial parent moving away. (*Jane J.*, *supra*, 237 Cal.App.4th at p. 904.) The court explained: "Because Father is not the custodial parent, he does not have a presumptive right to relocate the children to another region of the country simply because he acts in good faith and for a legitimate reason. Instead, as the noncustodial parent who seeks a change in custody involving an out-of-state move away, Father bears additional burdens of persuasion as part of the changed circumstances standard." (*Ibid.*)

The *Jane J.* court stressed that moving a child should not be permitted if it would be detrimental to the child. (*Jane J.*, *supra*, 237 Cal.App.4th at p. 904, citing *Burgess*, *supra*, 13 Cal.4th at p. 35.) The court reasoned that "'""the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—*weigh heavily in favor of maintaining ongoing custody arrangements*. [Citations.]""" (*Jane J.*,

27

*supra*, at p. 904, quoting *LaMusga*, *supra*, 32 Cal.4th at p. 1093, italics added; accord, *In re Marriage of Brown & Yana*, *supra*, 37 Cal.4th at p. 960.)  The father's burden of proof was very high because the noncustodial father was seeking to "upend the status quo by compelling both a change in custody and a move away," which amounted to "a double-barreled change."  (*Jane J.*, *supra*, at p. 905.)  Likewise, in the instant case, Father's burden of proof is very high.

In *Jane J.*, the court explained that this high burden of proof required the trial court, at a minimum, to balance the children's current situation in California and their proposed new situation in Alabama, with the father's substantial burden of showing that the children would not sustain detriment by the proposed move and that the out-of-state move away would serve their best interests.  (*Jane J.*, *supra*, 237 Cal.App.4th at p. 905.)  Similarly, in the instant case, Father, as the noncustodial parent, held the heavy burden of establishing that A.B. would not sustain detriment by the proposed move, and that moving A.B. out of state would serve A.B.'s best interests.  (*Ibid.*)  We conclude Father did not meet this heavy burden of proof.

D.  *Establishing a Lack of Detriment and Best Interests of the Child*

As explained in *Jane J.*, a family law judge should consider the following factors listed in *LaMusga*, *supra*, 32 Cal.4th at page 1101, when evaluating an out-of-state noncustodial parent's change of custody request:  "[T]he children's ages (and, if age appropriate, the children's wishes); community ties; health and educational needs; the attachment and past, present and potential future relationship of the children with each

28

parent; *the anticipated impact of the move upon the children's existing social, educational and familial relationships*; and each parent's willingness to facilitate frequent, meaningful and continuing contact to the other parent. [Citations.]" (*Jane J.*, *supra*, 237 Cal.App.4th at p. 905, italics added.) These factors are commonly referred to as the *LaMusga* factors. We recognize that this list of factors is not exhaustive. (*Jane J.*, *supra*, at p. 905.) "[E]ach case must be evaluated on its own unique facts." (*Burgess*, *supra*, 13 Cal.4th at p. 39.)

In *Jane J.*, the court concluded that the trial court acted precipitously in issuing its change of custody order and failing to weigh the disruption to the children from losing their existing home, school and support structure against the potential benefits from an out-of-state relocation. (*Jane J.*, *supra*, 237 Cal.App.4th at p. 906.) The trial court in *Jane J.* stated it ordered the change of custody because the court was concerned that, absent a change of custody, the mother would continue to interfere with the children's relationship with their father. Much of the evidence presented at the custody hearing was focused on the mother's efforts to limit the father's visitation and her refusal to allow him to exercise promised visitation when the father came to California. (*Id.* at pp. 906-907.)

The father in *Jane J.* argued in the trial court that the mother's unrelenting pattern of frustrating his visitation rights, coupled with findings that the father was more likely to permit frequent and continuing contact between the children and their noncustodial parent, alone provided adequate grounds for changing custody from the mother to the father. (*Jane J.*, *supra*, 237 Cal.App.4th at p. 907.) The *Jane J.* court rejected this

argument, explaining that "[i]t is certainly true that one of the key factors the court should address as grounds for modifying custody is the custodial parent's deliberate efforts to impair the children's frequent and continuing contacts with the noncustodial parent." (*Ibid.*) But the *Jane J.* court found that evidence of this factor was not sufficient. The *Jane J.* court noted that the parents' accusations against each other heightened the "toxic and corrosive effect of protracted and open-ended litigation regarding custody changes." (*Id.* at p. 908.) The *Jane J.* court suggested that, "[i]n this context, [the trial] court should consider whether judicial remedies other than a change in custody will further continuous and enduring relationships between the children and both parents without disrupting the children's interests in continuity and stability. It well may be that clearly defined visitation orders, with an enhanced allocation of time to Father, may obviate time-consuming and disruptive litigation. (*Ibid.*)

As in *Jane J.*, in the instant case the trial court found that the custodial parent, Mother, was the parent least likely to share the child with the other parent. McGinnis, concluded this in her report filed with the court. However, McGinnis nevertheless recommended the court order primary custody of A.B. remain with Mother. Regardless of whether there was evidence that Father was the parent less likely to interfere with the other parent's visitation, Father did not meet his burden of proving that the anticipated impact of A.B.'s relocation to Father's home in Arkansas would not be detrimental to A.B.'s existing social, educational and familial relationships. Such potential detriment includes detriment to A.B. from the significantly diminished contact with Mother, his

30

Stepfather, stepsiblings living with A.B., his school, his friends, his accustomed place of residence and community, and his doctors and therapists. (*Jane J.*, *supra*, 237 Cal.App.4th at p. 906.) The trial court did not fully address this weighty factor of detriment, and Father did not meet his burden of establishing a lack of detriment. A 730 evaluation would have been helpful in evaluating the anticipated impact of the move on A.B. but, as in *Jane J.*, the trial court did not order a 730 expert evaluator to analyze the matter and make recommendations for custody and visitation.

As suggested in *Jane J.*, *supra*, 237 Cal.App.4th 894, the trial court should also have considered alternative remedies to the drastic remedy of removing A.B. from Mother, with whom A.B. has lived for 12 years, and relocating him out of state to live with Father. The focus should be on the best interests of A.B., and not on penalizing the custodial parent by removing the child from the parent. We do not condone or intend to minimize the seriousness of Mother's custody order violations. Rather, we stress that, before removing a child from the custodial parent, the noncustodial, move-away parent must meet his or her heavy burden of showing that changing custody and relocating the child out of state would not detrimentally affect the child's continuity and stability and is in the child's best interests. Father has not met his heavy burden of proof in this regard. Furthermore, there is strong evidence that it is likely that relocating A.B. would be detrimental to his well-being and thus is not in his best interests.

E. *LaMusga Best Interest Factors*

Applying the *LaMusga* best interest factors, we conclude the weight of the evidence heavily favors not changing A.B.'s physical custody from Mother to Father.

(1) *A.B.'s Age and Wishes*

At the time of the October 2017 hearing on modification of child custody, A.B. was 11 and-one-half years old. He was an "A" student and capable of expressing his desires. Under Family Code section 3042, subdivision (c), "[i]f the child is 14 years of age or older and wishes to address the court regarding custody or visitation, the child shall be permitted to do so, unless the court determines that doing so is not in the child's best interests." In the instant case, A.B. was not at least 14 years old and was not asked in court what his preference was.

Under Family Code subdivision (a) of section 3042, "[i]f a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody or visitation, *the court shall consider, and give due weight to*, the wishes of the child in making an order granting or modifying custody or visitation." (Italics added.) Family Code section 3042, subdivision (d) further states that "[n]othing in this section shall be interpreted to prevent a child who is less than 14 years of age from addressing the court regarding custody or visitation, if the court determines that is appropriate pursuant to the child's best interests."

A.B. did not have the opportunity to tell the court his wishes regarding custody modification, and the court was not required to allow him to do so. However, there was

unrefuted evidence that at the time of the October 2017 custody hearing, and thereafter, A.B. adamantly objected to visitation with Father and A.B. has refused to have any contact with him. There is evidence that after the custody hearing but before entry of the final custody modification order on January 9, 2018, A.B. became extremely distraught when forced to go with Father during court-ordered visitation in December 2017. This resulted in a hearing in December 2017, during which A.B. confidentially expressed his desires to the court regarding visitation. It is this court's concern, based on the record, that A.B. may suffer severe harm from being forced to leave his home with Mother, with whom he has resided since birth, and relocate to his Father's home in Arkansas. Such a change in custody is contrary to the mediator's recommendation and is contrary to A.B.'s expressed desires. Furthermore, there has not been a 730 evaluation or other expert opinion on the potential harm of forcing A.B. to be uprooted and relocated to Father's home in Arkansas.

A 730 evaluation would have also been extremely helpful in evaluating the validity and veracity of A.B.'s reasons for not wanting to interact with Father, and the veracity of Father's accusations Mother was tainting his relationship with A.B. We note that the mediator, McGinnis, testified that she could not reach any conclusion or assessment as to whether Mother had committed parental alienation. A.B.'s age and expressed wishes weigh in favor of not changing his physical custody.

33

(2) *Community Ties*

The *LaMusga* factor of community ties also weighs in favor of not changing A.B.'s custody. There is substantial evidence that A.B. has strong ties to the community where he lives. His community ties include his involvement in his church, school, and sports activities, and his relationships with his friends and family. On the other hand, there is minimal, if any, evidence of A.B.'s community ties to the community where Father lives in Arkansas, other than that he would be living with Grandparents.

(3) *Health and Educational Needs*

The factor of health and educational needs also weighs in favor of not changing A.B.'s physical custody. A.B. would benefit from being able to continue seeing the same doctors and therapists who have treated him in the past and know his medical history. Also, Father lives out of state and has indicated that, because he is unemployed, he does not have health insurance coverage available for A.B. In addition, there is no evidence in the record as to whether A.B. would qualify for the same level of health insurance coverage in Arkansas under Mother's health insurance policy.

The educational needs factor weighs heavily in favor of not relocating A.B. as well. A.B.'s school records show that A.B. has been attending a private school, paid for by Mother, and A.B. has been an excellent student. Removing him from his school, teachers, and classmates could be extremely detrimental, particularly since he is now in middle school, which can be a difficult phase. Father has not provided any evidence as to

the quality of schooling A.B. would receive in Arkansas as compared with the education A.B. is currently receiving.

(4) *The Attachment and Past, Present and Potential Future Relationship of A.B. With Each Parent*

The evidence as a whole demonstrates that A.B. has had a relationship with both parents, but his relationship with Father became a long-distance relationship when Father moved to Arkansas in 2011. Before Father moved away, the parents shared physical custody, with Mother's home designated as A.B.'s primary residence. While Father lived in California, A.B.'s time share with Father was inconsistent, with Father visiting at times frequently and then not seeing A.B. for lengthy periods of time. After Father moved to Arkansas in 2011, visits became more infrequent, although Father may have remained in contact with A.B. by phone and other means, and A.B. visited Father during several summers. In September 2017, A.B.'s relationship with Father became strained, resulting in A.B. not wanting to visit or have any contact with Father. A.B.'s relationship with Father appears to have been negatively affected by Father's involvement with Stepfather's ex-wife, Tricia. There was evidence Father was staying with her in September 2017, and was assisting her with her child custody case against Stepfather.

The stability and continuity of A.B.'s relationship with Father, in the event he is relocated to Father's home, is questionable in light of Father's past history. Father has been living with his parents in Arkansas since 2011. He was hospitalized after attempting suicide in 2006. Father has remained unemployed since 2008, other than

35

taking a few small, part-time, temporary jobs. Although highly educated, Father's parents have been supporting Father since 2011. Father has not disclosed Grandparents' income. They are 82 and 87 years old. Evidence was presented at the custody hearing that Grandparents were willing to care for A.B. if he lived in their home, but no evidence was presented as to how Father would provide for and care for A.B. in the event Grandparents were no longer able to provide a home and financial support for A.B. and Father.

On the other hand, the evidence shows that A.B.'s past, present, and potential future relationship with Mother has been, and likely will continue to be, consistently close and stable, if A.B.'s physical custody remains with Mother. A.B. has lived with Mother since birth, and Mother has supported A.B. on her teacher's salary with little, if any, assistance from Father. Up until the recent court order changing custody to Father, Mother's home was ordered by the court as A.B.'s primary residence, with Mother in effect having sole physical custody when Father moved out of state in 2011. Mother remarried in 2016 and lives with A.B., Mother's husband, Stepfather, and his teenage son and daughter (16 and 15, respectively).

We conclude the evidence as a whole, as to A.B.'s attachment and relationship with each parent, weighs in favor of leaving A.B. in his current home with Mother.

(5) *Anticipated Impact of the Move Upon A.B.'s Existing Social, Educational, and Familial Relationships*

Father has not met his burden of addressing the anticipated impact of moving A.B. to Father's home in Arkansas upon A.B.'s existing social, educational or familial relationships. Furthermore, as discussed above, the overwhelming evidence in the record suggests that the impact on A.B. from such a drastic move could be extremely harmful to A.B.'s well-being. This factor weighs heavily in favor of not changing physical custody.

(6) *Each Parent's Willingness to Facilitate Frequent, Meaningful, and Continuing Contact With the Other Parent*

The trial court concluded that A.B. should reside with Father in large part because the court concluded Mother was the parent least likely to share A.B. with the other parent, as reflected by her custody order violations. We conclude, as the court did in *Jane J.*, that changing custody based on this factor was an abuse of discretion, because Father has failed to meet his burden of proving that relocating A.B. would not cause detriment to A.B. and is in A.B.'s best interests.

We recognize Mother conceded she violated the custody order in various ways, including failing always to inform Father and obtain his consent as to A.B.'s activities, health care, schooling, and other matters concerning A.B. However, there is little, if any, evidence that these violations harmed A.B. or were intended to interfere with Father's relationship with A.B. As to the trial court relying on the mediator's finding that Mother

37

was the parent least likely to share A.B. with the other parent, we note that the mediator nevertheless also concluded that physical custody of A.B. should remain with Mother.

Both parents have demonstrated on occasion an unacceptable, defiant attitude toward compliance with court orders. Mother has failed to fully comply with court-ordered notice and consent requirements and failed to list Father as a school emergency contact. Father, on the other hand, has failed to comply with the court's support orders by not timely paying all court-ordered child support.[5] Such violations of the court's orders by both Parents are not in A.B.'s best interest. Regardless, upon a thorough review of the record, we conclude that the nature of Mother's violations of the custody order do not justify removing A.B. from Mother's home, and relocating him to Arkansas to live with Father, particularly in the absence of any expert opinion that A.B. would not suffer detriment and that such a drastic move is in A.B.'s best interest.

---

[5] We recognize that Father's failure to pay any child support is not a valid basis for denying child custody or visitation. (*Camacho v. Camacho* (1985) 173 Cal.App.3d 214, 218-219.) We mention Father's failure to pay support merely to show his unwillingness to comply with important court orders, which have been entered in furtherance of the child's best interests.

V.

DISPOSITION

The January 9, 2018, child custody order, awarding Father primary physical custody and requiring A.B. to move to Father's home in Arkansas, is reversed. Mother is awarded her costs on appeal.

CERTIFIED FOR PUBLICATION

CODRINGTON
Acting P. J.

We concur:

SLOUGH
J.

FIELDS
J.