Filed 6/3/24  Marriage of Masai CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| In re Marriage of BRITTANY and CYNTHIA VASQUEZ MASAI. | B324297<br><br>(Los Angeles County Super. Ct. No. 17STFL04800) |
| BRITTANY J. MASAI,<br><br>     Appellant,<br><br>     v.<br><br>CYNTHIA VASQUEZ MASAI,<br><br>     Respondent. |  |

APPEAL from an order of the Superior Court of Los Angeles County, Wendy L. Wilcox, Judge.  Affirmed.

Gabbard Family Law and Nathan W. Gabbard, for Appellant.

Gay Family Law Center and Angelyn Gates, for Respondent.

## I.   INTRODUCTION

Brittany J. Masai (Brittany) appeals from a modification order that granted Brittany's former spouse, Cynthia Vasquez Masai (Cynthia), sole physical custody of their son E.M. (the child).  We affirm.

## II.   BACKGROUND

A.   *Prior Custody Order*

Brittany and Cynthia were married in 2015 and the child was born in February 2017.  On January 1, 2018, Brittany and the child moved to Texas.  On March 23, 2018, the trial court entered a judgment of dissolution.

The judgment (to which the parties had stipulated), included a custody order granting the parents joint legal custody of the child, with equal decision-making authority over "educational training, extracurricular activities, medical needs, and religious training."  The custody order awarded Brittany primary physical custody and Cynthia three to four consecutive days per month of parenting time.  Finally, the order provided "[that] a party without physical possession of [the child] shall be given reasonable, but not unlimited, telephonic contact with [the child] when in the physical care of the other parent."

In June 2020, Brittany moved with the child to Hawaii.  She did not give Cynthia prior notification of the move.  On

2

June 22, 2020, Cynthia filed an RFO[1] seeking a change in the custody and visitation orders. Specifically, she requested that she be granted primary physical custody of the child.

On July 29, 2020, following a hearing, the trial court modified the custody and visitation orders by replacing Texas with Hawaii as the child's primary residence. It modified the visitation order to grant Cynthia parenting time for "3–4 consecutive days (6–8 hours each day) per month . . . on the third Friday, Saturday, Sunday, and/or Monday." The court further ordered that "on Wednesdays and Saturdays of [Cynthia's] non-custodial time, [Cynthia] shall have telephonic or video calls with the [child]." The court rejected Cynthia's request to be awarded primary physical custody.

B.     *The Parties' RFOs*

On July 16, 2021, Brittany filed an RFO that Cynthia's visitation with the child be supervised and suggested that Cynthia had physically and sexually abused the child. Brittany also requested an order for the preparation of a parenting plan assessment (PPA). On September 10, 2021, the trial court appointed a child custody evaluator to conduct a PPA.

On January 28, 2022, Cynthia filed an RFO that the child attend kindergarten at the University Laboratory School for the 2022–2023 school year and that Brittany use the child's legal last

---

[1]     "In family law proceedings under the Family Code, the term 'request for order' (RFO) 'has the same meaning as the terms "motion" or "notice of motion" when used in the Code of Civil Procedure.' (Cal. Rules of Court, rule 5.92(a)(1)(A).)" (*In re Marriage of DeWolfe* (2023) 93 Cal.App.5th 906, 908, fn. 3.)

name for all school, medical, identification, and other official purposes.

On February 4, 2022, Brittany filed an opposition to Cynthia's January 28, 2022, RFO.

On February 9, 2022, Cynthia filed a supplemental response to Brittany's July 16, 2021, RFO, and requested that Cynthia be granted sole legal and physical custody of the child. She marked the box indicating that she sought a change in custody and declared, among other things, that Brittany: had refused to permit visitation by Cynthia on four of the past seven months; had cut visitation time short; had refused to cooperate on educational decisions by unilaterally enrolling the child in a preschool that was openly prejudiced against members of the LGBTQ community and required parents to sign a statement agreeing with the school's views[2]; refused to provide Cynthia with any video visits; falsely accused Cynthia of physical and sexual abuse; attempted to undermine the child's relationship with Cynthia by telling him that Cynthia was pretending to be his mother and that she was only a "'babysitter'"; and in January 2022, refused to bring the child to see Cynthia in Los Angeles.

On February 23, 2022, Dorian Dixon, the court-appointed child custody evaluator, filed a PPA which, among other things, recommended that Cynthia be granted overnight visits.

On March 16, 2022, Brittany filed an RFO seeking to immediately stay Cynthia's visitation with the child pending further investigation into purported safety concerns. Brittany

---

[2]     Cynthia acknowledged that Brittany subsequently agreed to enroll the child at another preschool that did not require the parents to sign an anti-LGBTQ statement, but in her view, the second school was also prejudiced against LGBTQ people.

4

attached to the RFO a two-paragraph letter from the child's therapist, recommending that visitation with Cynthia be suspended based on the child's reports of abuse.

C.    *RFO Appointing Counsel for the Child*

On August 17, 2021, Cynthia filed an RFO that the child be appointed independent counsel.  On August 30, 2021, Brittany filed an opposition to the RFO and requested that she be granted tie-breaking authority over school choice.  At a hearing on September 10, 2021, the trial court ruled that it was in the child's best interest to be appointed counsel.  Brittany then agreed with the selection of Michael Kretzmer as the child's appointed counsel.

D.    *Hearings and Testimony*

1.    March 2022 Hearing

On March 23, 2022, the trial court conducted a hearing on the various RFOs and the PPA.  Cynthia requested that overnight visits, which had been recommended by Dixon, should begin immediately.  Cynthia's counsel argued that Brittany had violated the joint legal custody order by unilaterally, and without notice to Cynthia, choosing a therapist and initiating therapy sessions for the child.

Kretzmer stated that he had met with the child, the parties, the co-parenting facilitator who had worked with the parties for a number of years, and the child's therapist. Kretzmer explained that the Hawaii Department of Human

Services, Child Welfare Services (CWS) had conducted an investigation into allegations of abuse and determined the allegations to be unfounded. He expressed skepticism about the child's therapist's recommendations, as they were based only on the therapist's conversations with Brittany, her limited interaction with the child, and no contact with Cynthia. And, contrary to the child's therapist's description, Kretzmer found the child to have "very positive" interactions with Cynthia and to be "quite comfortable" with her. He believed that overnight visits between the child and Cynthia were appropriate and should begin immediately. Finally, Kretzmer was concerned that Brittany was using her husband's last name as the child's last name and opined that Brittany had a lack of insight into how her conduct affected the child.

Brittany's counsel opposed overnight visits with Cynthia. She admitted that Brittany had begun having the child use Brittany's husband's name rather than his true legal name but explained that she did so in an effort to be inclusive of the child into his blended family. Counsel also admitted that Brittany had, without consulting Cynthia, commenced therapy sessions for the child with a therapist that she unilaterally chose.

Following testimony, the trial court granted overnight visits between Cynthia and the child, finding such visits were in the child's best interest. The court then continued the hearing to July 15, 2022.

### 2.    The Evaluator's Testimony

On July 15, 2022, Dixon testified that he had performed a two-day assessment in connection with the PPA on February 22

and 23 of 2022. As part of his assessment, Dixon conducted interviews with each parent for approximately 90 minutes, with the child for approximately five to 10 minutes, and with both the child and the parents for 15 to 20 minutes. Dixon also interviewed Brittany's husband, Brittany's mother, Cynthia's sister, Cynthia's mother, the court-appointed co-parenting facilitator, Dr. Lynn Rosenfield, and two Hawaii CWS social workers.

Dixon testified that Brittany's husband admitted that he and Brittany made the two allegations of abuse. CWS conducted the investigations and closed them as being "unconfirmed." As part of the second investigation, the child was required to undergo a forensic evaluation, which determined that "there was nothing to substantiate." A CWS social worker stated that the agency had no concerns about Cynthia and opined that the allegations "seemed to be a custody issue." In addition, Cynthia had been accompanied by two different family members during the visits during which Brittany alleged the abuse occurred. Dixon opined that frequent, false allegations of abuse are harmful to a child and forensic investigations can be traumatic.

The child seemed well-adjusted in the care of both parents. When the child was in Brittany's care, he was nonresponsive to Dixon's questions. By contrast, when the child was in Cynthia's care, he was able to tell Dixon his favorite color and toys, state his age and birthday, and talk about his school. The contrast in the child's responses was "stark." Dixon recommended that Cynthia's visiting time be increased.

Dr. Rosenfield, the co-parenting facilitator who had worked with the parents since 2017, told Dixon that Brittany was more knowledgeable about child development, while Cynthia would

benefit from taking parenting classes. Rosenfield believed, however, that Brittany was inflexible and would not work with Cynthia to facilitate a relationship between her and the child. Dr. Rosenfield's opinion about Brittany's inflexibility was consistent with Dixon's observations. For instance, Brittany wanted the time for Cynthia's visits to coincide with periods when the child was at school, and, when Cynthia asked for more or different times, Brittany refused. Dixon cited as another example an incident in August 2021, when Cynthia traveled to Hawaii to visit the child, but Brittany refused to allow the visit, citing COVID-19 concerns. Given Hawaii's travel protocols, Cynthia would not have been able to enter Hawaii without having had a negative test for COVID-19 prior to entry, yet Brittany still refused to allow Cynthia a visit. Moreover, there were no successful video calls between Cynthia and the child while visits were suspended for a period of 15 months during the COVID-19 pandemic.

Dixon opined that Brittany did not encourage the child to have a relationship with Cynthia and cited as examples Brittany: changing the child's last name at his preschool; making false allegations of abuse; and attempting to limit and prevent Cynthia's visitation with the child. Dixon also described how Brittany had omitted Cynthia's photograph from the family storyboard at the child's school.

Dixon had concerns about Brittany's enrollment of the child in a preschool with an open anti-LGBTQ bias. Although Brittany subsequently enrolled the child at a different school, Dixon opined it may not be in the child's best interest to attend a school that was prejudiced against at least one of his parents.

Dixon concluded that Brittany's conduct, which included unilateral decision-making and gatekeeping, could result in parental alienation between the child and Cynthia. Further, if Brittany continued in her course of conduct, an order awarding Cynthia primary physical custody would be appropriate. Dixon believed that Cynthia, not Brittany, was more likely to help foster a relationship between the child and the other parent.

### 3. Cynthia's Testimony

Cynthia testified that in the past year, she was unable to see the child "99.9 percent" of the time during video calls. Cynthia believed that Brittany would merely turn on the video call in a room and would not assist or encourage the five-year-old to participate in the video call. When the child was in Cynthia's care, Cynthia would encourage him to engage with Brittany during video calls. Cynthia reported that regular video calls had resumed after the July 2022 hearing.

Overnight visits went very well. The child's visits with Cynthia were at the home she shared with her parents, and he bonded with Cynthia as well as the grandparents.

When with Cynthia, the child referred to her as "Mama C.," "Mommy," or "Mama." When speaking to Brittany, however, he referred to Cynthia as "Caba." When Cynthia asked the child why he used the term, "Caba," the child responded that "Caba" is an alien, an imaginary friend, which is how Brittany and her husband described Cynthia.

4.     Brittany's Testimony

Brittany confirmed that she blocked Cynthia from seeing the child in August 2021 in Hawaii, despite Cynthia having passed restrictive COVID-19 testing prior to entry.  In December 2021, however, she traveled to Texas with the child.

Although she initially claimed that Cynthia had agreed to stop visiting with the child because of the ongoing CWS investigation, Brittany eventually admitted that she alone decided to stop the visits.  Brittany also admitted that there was no order restraining Cynthia from seeing the child.  Further, she admitted that she had enrolled the child in a preschool that required parents to sign a contract opposing the LGBTQ community.  She chose the school because "it's a high-academic school in Hawaii.  [¶]  Private schools have way better quality of education than the public schools."  She admitted she asked Cynthia to sign the contract denouncing members of the LGBTQ community.  In her view, it was not "a big deal" because if "we're still part of the LGBT community together, we're going to have way more influence on what [the child] believes than the school."  Regarding the allegations of abuse by Cynthia, Brittany maintained that she did not personally file the CWS cases and did not directly call CWS.  Instead, the child's pediatrician and therapist, as mandatory reporters, made the two reports.

Brittany stated that overnight visits for Cynthia and the child began in March 2022.  Brittany claimed that she encouraged the child to visit with Cynthia, even though he was unwilling to do so, and described the child as "clingy" following the visits.  Brittany blamed missed video calls between Cynthia and the child on poor internet connections.  She admitted that if

10

she had missed 15 months of visits with the child, which is how long Cynthia went without visits, she would be devastated.

E.     *Statement of Decision and Order*

On August 23, 2022, the trial court issued its statement of decision. The court found Cynthia had met her burden of demonstrating a material change in circumstances. The court "ha[d] not seen a clearer case of alienation."

The trial court found that Brittany prevented Cynthia from seeing the child in Hawaii in August 2021, citing COVID-19 concerns, despite Cynthia complying with Hawaii's restrictive entry guidelines at that time. Moreover, Brittany then visited Texas with the child in December 2021, demonstrating that she was not concerned about COVID-19, but rather used it as an excuse to prevent Cynthia from visiting the child. It also found that Brittany was not credible when she described the child as clingy and having issues after overnight visits with Cynthia.

The trial court also found Dixon's testimony that Brittany had alienated the child from Cynthia to be "credible and persuasive." The court specifically cited to: the family storyboard at the child's preschool that omitted Cynthia; Brittany's requirement that the child's visitation time with the child align directly with the child's preschool hours; Cynthia not seeing the child for 15 months in video chats; and Brittany selecting a therapist for the child without consulting Cynthia.

Finally, the trial court concluded that it was in the child's best interest to grant Cynthia primary physical custody and tie-breaking authority for legal custody decisions. It found Dixon's testimony that Cynthia spoke positively about Brittany and

11

encouraged the child to speak positively about her to be credible. Moreover, even before the initiation of overnight visits, the child had been well bonded with Cynthia. Cynthia also had a support system that would enable her to care for the child. The court cited as examples of Brittany's inability to make decisions that were in the child's best interests her enrollment of the child in a school that denounced the LGBTQ community and her assumption that Cynthia would sign an agreement denouncing that community.

The trial court also concluded that the factors in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*) supported a modification to the custody order.[3] (See *id.* at p. 1101 ["Among the factors that the court ordinarily should consider when deciding whether to modify a custody order in light of the custodial parent's proposal to change the residence of the child are the following: the children's interest in stability and continuity in the custodial arrangement; the distance of the move; the age of the children; the children's relationship with both parents; the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests; the wishes of the children if they are mature enough for such an inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently are sharing custody"].)

For the first factor, the child's interest in stability and continuity in the custody arrangement, the trial court found "the

---

[3] The trial court initially found that *LaMusga* did not apply. It alternatively concluded that if the factors did apply, they supported the court's order.

12

evidence shows that [Cynthia] talks positively about [Brittany] and encourages the . . . child to speak positively of [Brittany], and that it is [Cynthia] rather than [Brittany] who is more likely to promote a relationship with the other parent and the . . . child."

The trial court found for the second factor that there was no issue with distance because the child has "dealt with the distance for the last two years . . . ."

For the third and fourth factors, the child's age and relationship with the parents, the trial court was "encouraged by Mr. Dixon's testimony that the . . . child would and could be even more bonded with [Cynthia] following overnight visits."

For the fifth factor, the trial court found the relationship between the parents "has not been one where they have communicated and cooperated effectively; however, that is because of [Brittany] and her gatekeeping and attempts to alienate the . . . child from [Cynthia]. If [Brittany] could put the . . . child's interests above her interests the parties could potentially be able to communicate and cooperate effectively. However, the [c]ourt is concerned whether [Brittany] is capable of doing this. It appears [Brittany] is incapable of understanding how her actions harm the . . . child's relationship with [Cynthia]."

The sixth factor, the child's wishes, was not a factor because of his young age. For the seventh factor, the reason for the proposed move, the trial court concluded that there was a material change of circumstances and that granting Cynthia primary physical custody was in the child's best interest.

For the eighth factor, the trial court found that "the parents will continue to share custody in a way that is in the . . . child's bests interest and that will foster healthy relationships between the . . . child and each of his parents."

13

The trial court granted the parents joint legal custody and Cynthia tie-breaking authority and primary physical custody. The court ordered the child returned to California and granted Brittany visitation rights for the third weekend of each month in California.[4]  Brittany timely filed a notice of appeal.

## III.  DISCUSSION

### A.  *Applicable Law and Standard of Review*

"Under the so-called changed circumstance rule, a party seeking to modify a permanent custody order can do so only if he or she demonstrates a significant change of circumstances justifying a modification.  [Citation.]  According to our [Supreme Court's] earlier decisions, '[t]he changed-circumstance rule is not a different test, devised to supplant the statutory test, but an adjunct to the best-interest test.  It provides, in essence, that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question.  Instead, it should preserve the established mode of custody unless some significant change in

---

[4]     Brittany requests that we take judicial notice of:  the court docket in *Johnston-Rossi v. Rossi* (2023) 88 Cal.App.5th 1081; Hawaii statutes and administrative rules regarding child welfare investigations; and an opinion from the California Commission on Judicial Performance concerning a judge presiding over a family law matter being publicly admonished for improper comments about religion.  We exercise our discretion and judicially notice these documents.  (Evid. Code, §§ 452, 459, subd. (a).)  None of these documents, however, affect our decision.  (*In re S.B.* (2004) 32 Cal.4th 1287, 1296, fn. 3.)

14

circumstances indicates that a different arrangement would be in the child's best interest. The rule thus fosters the dual goals of judicial economy and protecting stable custody arrangements.' [Citation.]" (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 256 (*Montenegro*); see *Ragghanti v. Reyes* (2004) 123 Cal.App.4th 989, 996 ["[t]he changed circumstances test requires a threshold showing of detriment before a court may modify an existing final custody order that was previously based upon the child's best interest"].)[5]

"'The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test.' [Citation.] Under this test, we must uphold the trial court 'ruling if it is correct on any basis, regardless of whether such basis was actually invoked.' [Citation.]" (*Montenegro, supra*, 26 Cal.4th at p. 255.)

---

[5]    Cynthia contends that the changed circumstance rule does not apply to the trial court's order here because the prior physical custody order was based upon a joint agreement that granted Brittany "primary" physical custody and Cynthia "secondary" physical custody. In Cynthia's view, the prior custody order therefore granted her joint physical custody. We disagree. Both the initial and modified custody order granted Cynthia visitation with the child for three to four consecutive days per month. This amounts to sole physical custody by Brittany. (See, e.g., *In re Marriage of Lasich* (2002) 99 Cal.App.4th 702, 715, disapproved on other grounds in *LaMusga, supra*, 32 Cal.4th at p. 1097 [father with custody of child only 20 percent of time "amounts to sole physical custody for the mother with 'liberal visitation rights' for the father"].)

B.    *Prohibited Factors*

Brittany contends that the trial court abused its discretion by changing the custody order based on purportedly unlawful factors, specifically:  Brittany's lawful reporting of suspected sexual and physical abuse by Cynthia, in violation of Family Code section 3027.5[6]; considerations of gender and sexual orientation in violation of Family Code section 3020, subdivision (d)[7]; and her religious beliefs in violation of her freedom of religion.

We disagree with Brittany's characterization of the trial court's order.  The court did not change the custody order based "solely" on Brittany's "lawful" reporting of abuse.  Instead, the court considered Brittany's initiation of two false reports of sexual abuse as an example, among many, of her efforts to alienate the child from Cynthia.  (See *In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531 ["'Appellate courts 'do not

---

[6]    "A parent shall not be placed on supervised visitation, or be denied custody of or visitation with the parent's child, and custody or visitation rights shall not be limited, solely because the parent did any of the following:  [¶]  (1) Lawfully reported suspected sexual abuse of the child.  [¶]  (2) Otherwise acted lawfully, based on a reasonable belief, to determine if the child was the victim of sexual abuse.  [¶]  (3) Sought treatment for the child from a licensed mental health professional for suspected sexual abuse."  (Fam. Code, § 3027.5, subd. (a).)

[7]    "The Legislature finds and declares that it is the public policy of this state to ensure that the sex, gender identity, gender expression, or sexual orientation of a parent, legal guardian, or relative is not considered in determining the best interests of the child."  (Fam. Code, § 3020, subd. (d).)

reweigh evidence or reassess the credibility of witnesses'"].) And, to the extent Brittany contends that the court could not consider her efforts to alienate the child from Cynthia in determining custody, case law is to the contrary.[8] (*In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 960 (*Brown & Yana*), citing *LaMusga, supra*, 32 Cal.4th at pp. 1083–1085; *Speelman v. Superior Court* (1983) 152 Cal.App.3d 124, 132.)

Nor did the trial court violate Family Code section 3020, subdivision (d) by considering either parent's sexual orientation in determining the best interests of the child. Instead, it cited Brittany's enrollment of the child (whose parents both identified as members of the LGBTQ community) in a preschool that denounced that community and required parents to sign an agreement to do the same as an example of Brittany's inability to act in the child's best interest.

Finally, there is no evidence that Brittany's religious beliefs improperly influenced the trial court's ruling. The trial court specifically noted in its statement of decision that it "does not

---

[8] Brittany cites *In re Marriage of C.T. & R.B.* (2019) 33 Cal.App.5th 87 (*C.T. & R.B.*), and *Jane J. v. Superior Court* (2015) 237 Cal.App.4th 894 (*Jane J.*) as examples of cases in which the trial court erred by "focus[ing] primarily on the lack of encouragement from one parent for the relationship with the child and the other parent to support its decision to change custody." The trial courts in *C.T. & R.B., supra*, and *Jane J., supra*, erred, not by unduly emphasizing one factor over others, but by failing to consider all the *LaMusga* factors. (See *C.T. & R.B., supra*, 33 Cal.App.5th at p. 107 [trial court did not address detriment to child's relationships]; *Jane J., supra*, 237 Cal.App.4th at p. 901 [same].) Here, the record reflects that the trial court considered all the *LaMusga* factors when evaluating whether they supported a change of custody.

make any findings based on religion," and there is no contrary indication in the record. Accordingly, Brittany's arguments are meritless.

C. *No Abuse of Discretion*

Brittany next contends that the trial court abused its discretion by: (1) not sufficiently weighing the harm to the child from having a change in primary custody; (2) unduly emphasizing Brittany's lack of encouragement of the child's relationship with Cynthia to the exclusion of other factors; and (3) drawing the incorrect inferences from the evidence, for instance, by blaming Brittany for the 15 months during which Cynthia had no visits with the child.

"The trial court enjoys 'wide discretion' to order a custody change based upon a showing of detriment, including detriment caused to the relationship between the noncustodial parent and the child, if such a change is in the best interest of the child in light of all the relevant factors. (*LaMusga, supra*, 32 Cal.4th at p. 1095.) That is, a reviewing court generally will leave it to the trial court to assess the detrimental impact of a proposed move in light of other relevant factors in determining what is in the best interest of the child. (*Id.* at p. 1097.)" (*Brown & Yana, supra*, 37 Cal.4th at p. 961.) "We do not judge credibility on appeal." (*In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172, 1175.) "Moreover, it is settled that when conflicting inferences may be drawn from undisputed facts, the reviewing court must accept the inference drawn by the trier of fact so long as it is reasonable." (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 913.) Because we do not reweigh the evidence on

18

appeal or consider, de novo, the best interests of the child, we conclude the trial court did not abuse its discretion when it issued its modification order.

D.    *Evidentiary Challenges*

Brittany next raises several evidentiary challenges on appeal.  We review a trial court's evidentiary rulings for an abuse of discretion.  (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446–447.)

1.    Brittany's husband

Brittany included her husband on a witness list and proffered that he would "testify regarding his observations of the . . . child, his interview with the PPA evaluator, and the PPA recommendations."  Her counsel then requested to call the husband as a rebuttal witness and proffered that he would testify "about the 'Explicit Movement.'"[9]  The trial court observed that the witness list did not include an offer of proof as to the "Explicit Movement" and, in any event, the proffered testimony was not relevant and would be cumulative of Brittany's testimony. Counsel then requested that the husband be able to testify that he identifies as a pansexual and a member of the LGBTQ community.  The court responded that Brittany should testify

---

[9]    Although both parties testified about the "Explicit Movement," the court did not consider any such testimony in rendering its decision because that testimony "was not clear to the [c]ourt."

19

first and "[i]f at some point I find that I need to hear from him, I will."

On appeal, Brittany contends that the trial court erred when it "refused to allow [her] husband to testify." According to Brittany, her husband would have provided corroborating testimony about the child's relationship with his younger brother. We find no prejudicial error. Contrary to her assertion on appeal, Brittany did not advise the court that her husband intended to testify about the child's relationship with his younger brother. Instead, counsel proffered that he would testify about the "Explicit Movement" and his identity as a member of the LGBTQ community. "A judgment cannot be set aside on the ground that the court erroneously excluded evidence unless the substance, purpose and relevance of the excluded evidence were made known to the court by an offer of proof or by other means. (Evid. Code, § 354, subd. (a).)" (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1113.) In any event, the court did not preclude Brittany's husband from testifying and stated that, if necessary, the husband could testify at a later time. Brittany did not seek to call him at any other time during the proceedings. Thus, she has forfeited her argument on appeal. (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264 (*Keener*).) Finally, even assuming Brittany had provided an adequate offer of proof and further assuming the court had abused its discretion in not considering the husband's testimony, Brittany cannot demonstrate prejudice because the court accepted Brittany's proffer that the child had a close relationship with his younger brother, finding that he is "happiest seeing his [half-sibling]." (See *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 822–823 [appellant must demonstrate prejudice].)

20

2. Expert Testimony

On July 22, 2022, Brittany made an ex parte request to have Dixon's report reviewed by her own expert. On July 22, 2022, the trial court denied the request, finding that the application was not supported by exigent circumstances. On July 26, 2022, Brittany filed an ex parte request for a continuance on the grounds that she believed "expert rebuttal was needed." On July 26, 2022, the court denied the request because Brittany had failed to show good cause or exigent circumstances. The court observed that "[Brittany] has had the Parenting Plan Assessment recommendations and these issues have been pending since the report dated February 23, 2022 . . . ."

On appeal, Brittany does not challenge the trial court's denial of her request for a continuance. Instead, she characterizes her request for a continuance as "an offer of proof for her own expert to testify about key evidence, data, and procedures necessary in making any custody orders that amount to full change in custody," which she contends "[t]he court summarily denied." We disagree with Brittany's characterization of the record. There was no "[i]mproper denial of Brittany's request for expert testimony."

E.    *Issues Concerning the Child's Counsel*

Brittany raises several complaints about the conduct of the child's counsel.  She contends that counsel:  failed to file or serve a form FL-332 or any other declaration of qualification; improperly aligned with Cynthia's position; made improper recommendations instead of presenting admissible evidence; and failed to disclose potential conflicts of interest.  We reject these arguments.

Each superior court must develop local court rules "that provide for acceptance and response to complaints about the performance of the court-appointed counsel for a child."  (Cal. Rules of Court, rule 5.240(e).)  The Los Angeles County Superior Court, Local Rules, rule 5.21 provides:  "Complaints regarding the conduct and procedures employed by counsel appointed for a child pursuant to Family Code section 3150 *et seq.* will be handled by the judicial officer to whom the case is assigned. Complaints may also be made to the State Bar of California. Pursuant to noticed motion, application, or order to show cause, the judicial officer must determine what action should be taken, if any."  Brittany did not file a complaint regarding conduct by the child's counsel.  Accordingly, she has forfeited her arguments about the child's counsel's conduct on appeal.  (*Keener, supra*, 46 Cal.4th at p. 264.)

As to the purported conflict of interest, Brittany asserts that the child's counsel was counsel of record for an appellant in *Johnston-Rossi v. Rossi, supra*, 88 Cal.App.5th 1081, during the pendency of this proceeding.  But she does not explain why she is entitled to a reversal on this basis.  She has therefore waived her

argument on appeal.  (*L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 620.)

F.    *Scope of Relief*

Finally, Brittany argues that the trial court exceeded the scope of its authority by modifying the custody order because only Brittany's motion regarding visitation and request for a PPA was pending before it.  We find no prejudicial error.

"'In a hearing on . . . a motion, . . . the responding party may seek affirmative relief alternative to that requested by the moving party, on the same issues raised by the moving party, by filing a responsive declaration . . . . .'  ([Fam. Code,] § 213, subd. (a).)"  (*In re Marriage of Perow & Uzelac* (2019) 31 Cal.App.5th 984, 990, fn. 4.)  This applies to "[a]ny other proceeding in which there is at issue the visitation, custody, or support of a child."  (Fam. Code, § 213, subd. (b)(3).)  "Family Code section 213's restrictions on affirmative relief are aimed at keeping each modification proceeding limited in scope to the substantive issues raised in the moving papers . . . ."  (*In re Marriage of Perow & Uzelac, supra*, 31 Cal.App.5th at p. 990.)

Here, Brittany sought an order requiring that Cynthia's visits with the child be limited to "professionally supervised visitation only" and for the preparation of a PPA, which would presumably evaluate the custody order that had granted Cynthia visitation with the child.  In her supplemental responsive declaration, Cynthia marked the box indicating that custody was at issue and requested sole legal and physical custody of the child.  Accordingly, the issue of custody was properly before the court. (See *Brody v. Kroll* (1996) 45 Cal.App.4th 1732, 1736

[change of circumstances coupled with father's response placed issue of custody before court].)  Moreover, even if the relief requested in Cynthia's responsive declaration was beyond the scope of the issues raised in Brittany's RFO, Brittany did not object to proceeding on a determination of custody before the trial court.  She has therefore forfeited the argument on appeal. (*Keener, supra*, 46 Cal.4th at p. 264.)[10]

---

[10]  Brittany also suggests that, contrary to the trial court's statements, the court may have considered events that occurred prior to the orders that are being modified.  And, "[t]o the extent any portion of the order modifying custody relied on facts litigated previously, it is prejudicial error."  We presume the trial court followed the law, and it is appellant's burden to demonstrate otherwise.  (*Sonoma Land Trust v. Thompson* (2021) 63 Cal.App.5th 978, 984.)  Brittany has not met her burden to so demonstrate.

## IV.   DISPOSITION

The order is affirmed.  Cynthia is awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM, J.


We concur:


BAKER, Acting P. J.


LEE, J.*

---

\*      Judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.