Filed 11/12/24  Marriage of Claudia K. and William K. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re Marriage of CLAUDIA and
WILLIAM K.

---

CLAUDIA K.,

     Appellant,

v.

WILLIAM K.,

     Respondent.

E081274

(Super.Ct.Nos. FAMSS1608574)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Aruna P. Rodrigo,
Judge.  Affirmed.

Law Office of Zulu Ali & Associates, Zulu Ali and M. Lance Kennix for
Appellant.

William K., in pro. per., for Respondent.

1

# I.  INTRODUCTION

In 2017, a judgment was entered pursuant to Family Code[1] section 2024 dissolving the marriage of William K. and Claudia K.[2]  The judgment included a final custody order providing for joint physical and joint legal custody of their two minor children.  William remarried and moved to Oregon; Claudia remarried and remained in California; and the two made informal arrangements with respect to dividing their time with the children.

In May 2022, Claudia and her new husband were involved in a domestic violence incident while the children were present in the home.  Law enforcement intervened, an emergency protective order and criminal charges were filed against Claudia's husband, and an investigation was initiated by the relevant child protective services agency.  When William learned that Claudia had let her husband back into the home following the expiration of the emergency protective order, he filed a petition seeking modification of the custody order to permit the children to move to Oregon and to grant him full physical custody of the children.

After conducting a trial on the petition, including days of live testimony by both parties, the trial court granted William's petition and modified the custody order to grant

---

[1]  Undesignated statutory references are to the Family Code.

[2]  Because this case involves a potential victim in a criminal proceeding, the protected parties in a domestic violence related restraining order, and children in proceedings under the Family Code, we refer to the parties by first name and last initial to protect their privacy and their children's privacy.  (Cal. Rules of Court, rule 8.90(b)(1), (4).)  Additionally, because the parties share the same last name, we will refer to each party by first name only for clarity; no disrespect is intended.

William full physical custody and to permit the children to move to Oregon. Claudia appeals, arguing the trial court abused its discretion in modifying the existing custody order. We find no abuse of discretion in the record and affirm the order.

## II. BACKGROUND

A. *Procedural History*

In 2017, a judgment was entered dissolving the marriage of William and Claudia. The judgment included a final custody order that awarded William and Claudia joint legal and joint physical custody of their two minor children with a reasonable right of visitation to the party not exercising physical custody at any given time.

In July 2022, William and Claudia filed competing petitions requesting modification of the existing custody order. William's petition requested the trial court grant him sole physical custody of the children while maintaining joint legal custody; whereas Claudia's petition requested the trial court grant her sole physical and sole legal custody of the children. In response to the competing petitions, the trial court set the matter for a noticed hearing. The hearing spanned the course of multiple days in which the trial court received numerous documents and heard live testimony from both Claudia and William.

B. *Declarations in Support of Petitions*

In support of his petition, William submitted a declaration attesting that he now resided in Oregon and that, up to this point, the parties had informally worked out how to divide their custody time. Generally, the children would spend their time with Claudia when their physical presence in school was required, but they would spend time with

3

William during extended weekends, holidays, summers, and remote learning during the COVID-19 pandemic. William had recently been informed that the children were home during a domestic violence incident, which resulted in the arrest of Claudia's husband, criminal charges being filed against Claudia's husband, and the opening of an investigation by child protective services. William recounted various comments from both his children suggesting that this may not have been an isolated incident.

In support of her petition, Claudia submitted a declaration attesting that her children were currently in Oregon and that William had failed to return the children to California on a previously agreed upon date. Claudia attested that the children spend the majority of the year with her and have never lived permanently outside of California. Claudia acknowledged there had been an incident in May 2022 with her husband in which the "authorities were involved," but she asserted that the children did not directly witness the incident because "they were in their bedroom when the incident occurred." She further acknowledged that child protective services initiated an investigation as a result of the incident but stated that the investigation had now concluded without any further action. She stated that her husband has since returned to the home.

C. *William's Testimony*

William testified that, after his separation from Claudia, the two reached an informal agreement regarding how best to divide their custody time. Generally, the children would stay with Claudia during the academic school year and stay with William whenever their physical presence at school was not needed—including weekends, extended weekends, holiday breaks, summer break, and a period of time during the

4

COVID-19 pandemic when they were required to utilize remote learning. At the end of 2021, William remarried and moved to Oregon, but the informal agreement regarding custody time continued, with the children spending their spring and summer breaks with William.

In May 2022, William received an unexpected call from Claudia informing him that he would be contacted by child protective services regarding an "altercation" at Claudia's home. Claudia did not share any details, and William assumed it was a minor altercation. However, over the summer break, the children began to share more with William regarding the incident, describing a situation where they heard loud arguing between Claudia and her husband and witnessed Claudia "beaten up and bloodied" after the argument. He researched the incident and discovered a police report that suggested that the incident involved a baseball bat and charges of assault with a deadly weapon filed against Claudia's husband.

William contacted Claudia and learned that she had let her husband back into the home while the children were away for the summer, and that she intended to bring the children on a camping trip with her husband. William testified he became concerned because Claudia appeared to be brushing off a serious domestic violence incident. According to William, both children expressed their desire to stay in Oregon until a new custody arrangement could be worked out. He attempted to enroll his children in therapy to address any unresolved trauma from the incident, but he only managed to place the children on a waiting list.

William testified that, when he drove the children back to California at the end of

5

their summer break, the children expressed fear upon seeing vehicles belonging to Claudia's husband parked outside of Claudia's home. Claudia took no action to enroll the children in therapy until urged to do so by William and, even then, Claudia only agreed to family therapy sessions in which Claudia would be present.

With respect to any proposed move to Oregon, William acknowledged that his children were still trying to navigate their relationship with his new wife, but that the children had good relationships with their stepsiblings. He had consulted with the local school district and confirmed that it could accommodate his children's educational and developmental needs.

D. *Claudia's Testimony*

Claudia testified that in May 2022, she and her husband were involved in a domestic violence incident in which her husband punched her in the mouth, grabbed a baseball bat, and threw the baseball bat at her "side." She admitted that the incident resulted in the issuance of an emergency restraining order and the filing of criminal charges against her husband for inflicting physical injury on a spouse in violation of Penal Code section 273.5 and assault with a deadly weapon in violation of Penal Code section 245. However, Claudia testified that she had since been notified that the district attorney did not intend to pursue the charges. When asked by the trial court whether she was cooperating with the district attorney in pressing the charges, Claudia provided

inconsistent answers.[3]

Claudia conceded that she previously experienced "issues" in her current marriage resulting in her husband moving out for a period of time in 2021. She also conceded that the May 2022 incident was not the first time law enforcement had been called to her home as the result of arguments with her husband. However, she opined that prior incidents did not involve domestic abuse because her husband had "never hit" her and was "never arrested." Claudia acknowledged that her children had been present in the home during past incidents of domestic violence, but she stated that her children were never physically harmed and never directly witnessed any of the incidents. However, when pressed, she also conceded that any domestic violence within a home can be a form of abuse to the children, that her children witnessed the results of domestic violence in her home, and that the children saw her bloodied face following the May 2022 incident.

Claudia admitted that she let her husband back into the family home about one week after the May 2022 domestic violence incident, despite representing in her declaration that she waited a period of months before letting her husband back into the home. Claudia insisted that she only let her husband back into the home after "there [were] rules set," which included a prohibition against drinking alcohol in the home or around the children. However, she also testified that she did not believe her husband ever

---

[3] Specifically, the trial court asked: "Are you cooperating with pressing charges against [your husband]?" In response, Claudia initially answered: "No, . . . charges have never been up to the victim to either press or drop." When asked a second time, Claudia responded, "Yes," she was cooperating but conceded that, at the same time, she would like her husband back in her home.

had a problem abusing alcohol "up until" the May 2022 incident. Claudia testified that her husband was now enrolled in a substance abuse treatment program, but she admitted that he did not seek treatment until after Claudia learned of William's intent to seek modification of the custody order. She further opined that she did not actually believe her husband needed such treatment and that he was only doing it in response to the pending custody dispute.

Claudia conceded that she did not attempt to provide her children with any therapy or counseling until months after the May 2022 incident, but she expressed her belief that such measures would not be helpful because her children "have gone through so much trauma" and simply needed to spend more time with their mother. Claudia further conceded that there were times when her children would be at home alone with her husband.

With respect to the request to move the children to Oregon, Claudia asserted that her children were emotionally and verbally abused by William's wife. In support, she recounted various instances in which the children reported that William's wife made comments that the children found uncomfortable or insulting. However, Claudia admitted she had no personal knowledge of any of these instances and had never raised the issue with the court prior to the request for modification of child custody. Claudia also testified that her children had extensive family support in California—including maternal grandparents, maternal uncles and aunts, and 16 first cousins—and that her children had "lifelong" school friends in California; but, she also acknowledged that her children got along with their stepsiblings in Oregon.

Finally, Claudia was repeatedly asked about a phone conversation with one of her children in July 2022. When asked about specific statements made during the conversation, Claudia repeatedly stated that she could not "recall" any of them. A recording of the phone conversation was introduced as impeachment evidence and showed that Claudia repeatedly told her children they had been "kidnapped" by William and repeatedly attempted to shame the children for expressing their desire to stay in Oregon.

E. *Ruling and Order*

On April 19, 2023, the trial court made findings and issued its order regarding the request for modification of custody. The trial court (1) found that William met his burden to show a material change in circumstances that would justify revisiting the existing custody order; (2) found that the best interest of the children warranted modification of the existing custody order; and (3) modified the custody order to grant William full physical custody of the children and permit the children to move their residence to Oregon. With respect to the best interest of the children, the trial court made specific factual findings that: (1) the children's interest in stability and continuity of the existing custody agreement weighed against granting modification; (2) the children's health, safety, and wellbeing weighed in favor of granting the modification; (3) Claudia's inability to put the children's interests above her own individual interests weighed in favor of granting the modification; and (4) all other relevant factors were neutral and did

9

not weigh in favor or against modification.[4]  Claudia appeals from the order.

## III.  DISCUSSION

A. *General Legal Principles*, *Standard of Review*, *and Issues Presented*

"Where . . . there is a final custody determination in place, a postjudgment request to modify custody requires the moving party to demonstrate not just the best interest of the child but changed circumstances.  [Citation.]  'Under the so-called changed circumstance rule, a party seeking to modify a permanent custody order can do so only if he or she *demonstrates a significant change of circumstances justifying a modification*.' " (*Johnston-Rossi v. Rossi* (2023) 88 Cal.App.5th 1081, 1087; *In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 956.)  Absent a showing of changed circumstances, the trial court has no occasion to reconsider the existing custody order, regardless of whether evidence might suggest modification would be in the best interest of the children.  (*In re Marriage of C.D. & G.D.* (2023) 95 Cal.App.5th 433, 436-438.)

If a change of circumstances is shown, the trial court then considers all relevant factors in determining whether modification of the custody order will be in the best interests of the children.  (*In re Marriage of McKean* (2019) 41 Cal.App.5th 1083, 1089-1090; *In re Marriage of Brown & Yana*, *supra*, 37 Cal.4th at p. 960 ["If the noncustodial parent makes the required initial showing . . . , the court is then obligated to 'perform the

---

**4**  When stating its reasons, the trial court specifically reviewed factors such as: the distance of the proposed move to Oregon; the minor children's expressed preferences; the children's relationship with both parents; the reasons for William's move to Oregon; the potential impact of any move on the children's relationship with either parent; the impact of the proposed move on the children's health and educational needs; and the current custodial arrangement.

delicate and difficult task of determining whether a change in custody is in the best interests' of the child."].)  Generally, in making this best-interest determination, the trial court should consider factors such as:  (1) the health, safety, and welfare of the child; (2) any history of abuse by one parent or any other person seeking custody; (3) the nature and amount of contact with both parents; and (4) substance abuse by either parent. (§ 3011; *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 31-32.)  However, the statutory factors are nonexclusive, and the trial court "must look to *all the circumstances* bearing on the best interest of the minor child."  (*Burgess*, at pp. 31-32.)

When a proposed modification involves moving the children's residence out of state, the trial court also considers factors such as "the child's interest in stability and continuity in the custodial arrangement; the distance of the move; the child's age; the child's relationship with both parents; the relationship between the parents, including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the child's interests above their individual interests; the child's wishes if the child is mature enough for such an inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently share custody."  (*In re Marriage of Brown & Yana*, *supra*, 37 Cal.4th at pp. 960-961; *In re Marriage of C.T. and R.B.* (2019) 33 Cal.App.5th 87, 106 [listing factors].)

"The Court of Appeal applies an abuse of discretion standard of review to the trial court custody ruling."  (*In re Marriage of C.T. & R.B.*, *supra*, 33 Cal.App.5th at p. 97.) However, "[t]he abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review.  The trial

11

court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712; *In re Marriage of DeSouza* (2020) 54 Cal.App.5th 25, 33 [same]; *In re Marriage of Nakamoto & Hsu* (2022) 79 Cal.App.5th 457, 469 [same].)

In this case, Claudia generally asserts that the trial court abused its discretion in modifying the existing custody order, but the precise nature of her claim is unclear from the opening brief. Nevertheless, none of Claudia's arguments suggest the trial court erred by applying an incorrect legal standard, and our own review of the record shows that the trial court applied the legal principles we have detailed above.[5] Thus, we proceed to analyze whether the trial court's factual findings are supported by substantial evidence and whether its application of the law to the facts was arbitrary or capricious. As we explain, we find nothing in the record to suggest the trial court abused its discretion on either of these grounds.

B. *Substantial Evidence Supports the Trial Court's Factual Findings*

In her opening brief, Claudia argues that the trial court "erred in its assessment of [her] response to the children's trauma" and drew inferences that were "unwarranted and not substantiated by the broader context of the situation" regarding her response to a

---

[5] The trial court made a finding that William met his initial burden to show a material change in circumstances, warranting reconsideration of the existing custody order; made a separate finding that the best interests of the children supported modification of the order; and listed each of the relevant factors identified in the case law in conducting its best interest analysis.

12

pattern of domestic disputes; and she urges us to "reconsider the trial court's interpretation of [her] actions and decisions." Claudia also suggests that the trial court's decision was erroneous in that it failed to adequately consider the health, safety, and welfare of the children. We interpret these arguments as a challenge to the trial court's factual findings that the health, safety, and welfare of the children, as well as Claudia's inability to place her children's interests above her own, were both factors that weighed in favor of modification of the existing custody order.[6] However, we conclude that substantial evidence in the record supports the trial court's factual findings on these points.

Claudia conceded in her declaration and testimony that there was a domestic violence incident in May 2022 that resulted in the issuance of an emergency restraining order, the filing of criminal charges against her husband, and the initiation of an investigation by the relevant child protective services agency. She admitted that the

---

[6] The opening brief does not suggest that any other factual findings were erroneous. However, to the extent that Claudia intended to challenge other factual findings, we would conclude that she has failed to meet her burden on appeal to show error. On appeal, " 'we presume that the record contains evidence to sustain every finding of fact,' " and " '[i]t is the appellant's burden to demonstrate that it does not.' " (*Ashby v. Ashby* (2021) 68 Cal.App.5th 491, 512.) Thus, " ' " '[a] party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient*. [Citation.]' [Citation.] . . . 'He cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked his responsibility in this respect.' " ' " (*Ibid.*; *In re Marriage of Marshall* (2018) 23 Cal.App.5th 477, 487.) Claudia's opening brief makes no attempt to summarize any of the documentary or testimonial evidence presented to the trial court. Absent such a summary, she has not met her burden on appeal to show that any factual finding was unsupported by substantial evidence.

children witnessed the aftermath of this incident and witnessed her face "blood[ied]," and she conceded that domestic violence within a home presented a risk of danger to children in the home.[7]  Throughout her testimony, Claudia alluded to a pattern of recurring domestic disputes with her husband, acknowledging that at one point the disputes were so great that her husband moved out of the home for a period of time, and that the May 2022 incident was not the only time law enforcement had been called to her home.  Finally, Claudia conceded that she let her husband back into the home only a week after the incident, and that her work schedule necessitated that the children spend periods of time alone in the home with her husband.  This was substantial evidence upon which the trial court could rely to conclude that removing the children from Claudia's home would promote their health, safety, and welfare.

Additionally, Claudia conceded during her testimony that she never initiated steps to seek therapy or counseling for her children, despite acknowledging that "they have gone through so much trauma."  Both Claudia and William testified that she enrolled her children in therapy only at the urging of William and, even then, Claudia would only agree to family therapy sessions in which she was present.  Claudia also testified that she

---

[7] We observe that, even if Claudia had not conceded this point, the trial court would have been justified in drawing this inference.  As is firmly recognized in case law: "[e]ven if a child suffers no physical harm due to domestic violence, a 'cycle of violence between . . . parents constitute[s] a failure to protect [a child] "from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." ' "  (*In re V.L.* (2020) 54 Cal.App.5th 147, 156; *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 28 [ Even when a statutory presumption involving domestic violence does not arise, domestic violence in the home is a relevant factor in determining whether "it is in [the child's] best interests to grant [a] motion to move away with [the child] . . . or to change the established custody arrangement . . . ."].)

14

let her husband back into the family home only after setting strict rules regarding alcohol consumption, but later asserted that her husband did not have a serious drinking problem, and later admitted that her husband agreed to enroll in an alcohol abuse treatment program only because of the pending child custody proceedings. Finally, the trial court heard a recorded conversation between Claudia and her daughters in which Claudia repeatedly spoke ill of William, accused William of "kidnapping" the children, and attempted to shame her children for expressing any desire to stay in Oregon. This was substantial evidence upon which the trial court could rely to reasonably conclude that Claudia was unwilling to place her children's interests above her individual interests.

While Claudia asserts that the trial court drew the wrong inferences from the evidence before it,[8] on review for substantial evidence, " 'the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. . . [I]t is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.' " (*In re Marriage of Goodwin-Mitchell & Mitchell* (2019) 40 Cal.App.5th 232, 239.) Thus, the

---

[8] Specifically, Claudia contends that the trial court "erred in its assessment", "mischaracteriz[ed]" and "misconstrue[d]" the evidence regarding Mother's actions as well as drew inferences that were "unwarranted . . . by the broader context of the situation" in a way that "overlooks the nuance[e]" of the situation, encouraging this court to "reconsider the trial court's interpretation" of the evidence.

fact that the trial court could have drawn competing inferences from the evidence does not establish a lack of substantial evidence warranting reversal.

C. *The Trial Court's Application of the Law to the Facts Was Not Arbitrary or Capricious*

Claudia also argues that the trial court's decision "minimized the significance of the stable and nurturing environment that [Claudia] had consistently provided" and "disrupted the children's established patterns of care and emotional bonds" in a manner "contrary to the public policy that underscores the importance of continuity and stability in custody arrangements." We interpret these arguments as a challenge to the trial court's application of the law to the facts when deciding what weight to afford the relevant factors. However, under the abuse of discretion standard, the trial court's application of the law to the facts warrants reversal only if arbitrary and capricious. (*In re Marriage of Nakamoto & Hsu*, *supra*, 79 Cal.App.5th at p. 469; *S.Y. v. Superior Court* (2018) 29 Cal.App.5th 324, 333-334 ["even if we disagree with the trial court's determination, we uphold the determination so long as it is reasonable"].) As we explain, we cannot conclude that the trial court's determination in this case was arbitrary, capricious, or unreasonable under the circumstances.

Here, the trial court found that two established factors weighed in favor of granting William's request for sole physical custody of the children including: (1) the health, safety, and welfare of the children; and (2) Claudia's unwillingness to put her children's interests above her individual interests. It found that the stability and continuity of the current custody arrangement weighed against modification, and that the

16

remaining factors were neutral. Thus, in determining whether modification of the custody order would serve the children's best interest, the trial court was required to weigh competing factors.

In this case, a greater number of factors weighed in favor of modification. But more importantly, one of the factors that weighed in favor of modification was the health, safety, and welfare of the children. As Claudia acknowledges on appeal, the health, safety, and welfare of the children is statutorily recognized as the trial court's "primary concern in determining the best interests of children when making any orders regarding the physical or legal custody . . . of children." (§ 3020, subd. (a).) Thus, it was not unreasonable for the trial court to consider this factor as having more weight than the countervailing factor of stability and continuity when reaching its ultimate decision. Where the primary factor of health, safety, and welfare weighed in favor of modification and a greater number of factors weighed in favor of modification compared to the factors that weighed against modification, we cannot conclude that the trial court exercised its discretion in an arbitrary or capricious manner. Absent a showing that the trial court's weighing of factors was arbitrary, capricious, or exceeded the bounds of reason, Claudia has not established that the trial court abused its discretion in its application of the law to the facts.

## IV.  DISPOSITION

The order is affirmed.  Respondent to recover costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS                          
J.

We concur:

RAMIREZ                    
P. J.

CODRINGTON             
J.